156 So.2d 351

**BARBER PURE MILK COMPANY OF MONTGOMERY, INC.**

v.

**ALABAMA STATE MILK CONTROL BOARD et al.**

3 Div. 913.

Supreme Court of Alabama.

Sept. 5, 1963.

Sol Brinsfield, Jr., Montgomery, for appellant.

Maultsby Waller, Montgomery, for appellee Alabama State Milk Control Bd.

Walter P. Gewin, Tuscaloosa, and Watkins C. Johnston, Montgomery, for appellees intervenors.

GOODWYN, Justice.

Appeal by Barber Pure Milk Company of Montgomery, Inc., from a judgment of the circuit court of Montgomery County sustaining Orders 372 and 389 of the Alabama State Milk Control Board. The proceeding was brought to the circuit court by certiorari, on Barber's petition, to that end, pursuant to Code 1940, Tit. 22, § 226. The appeal here is pursuant to Code 1940, Tit. 7, § 1074. See: White Way Pure Milk Co. v. Alabama State Milk Control Board, 265 Ala. 660, 663, 93 So. 2d 509.

A group of milk producers who supply Barber, a milk distributor, have intervened as parties.

Order 372, issued December 12, 1956, as here pertinent, was the general price fixing order for milk sold by producers to distributor and producer-distributor licensees of the Board, under which the milk industry in Alabama was operating at the time of the alleged violations thereof by Barber. Order 389 was issued on February 13, 1959, after a hearing was held by the Board on a complaint made by it that Barber had failed to make certain payments to its producers in accordance with Order 372.

The Board has established five milk classifications, including "Government Contract Milk." Of these, Class I is the most important to the producer, since it calls for the highest pay by the distributor. Each producer is allotted a quota of milk for which the distributor is obligated to pay at the Class I price. Classes II and III are not material in this proceeding. Class IV consists of milk purchased by a distributor from a producer in excess of the class quotas established for each producer. Under Order 372, the highest price is paid for Class I milk and the lowest for Class IV. For "Government Contract Milk" (which is milk used to fulfill the United States government's requirements on military bases and federal installations), producers are to be paid the Class I price, except during April, May and June, when the Class IV price applies.

On October 14, 1958, the Board issued a "show cause order" and filed a four-count complaint against Barber charging

that it had underpaid its producers during two pay periods for milk sold under government contract and to another Alabama distributor, Cloverleaf Dairy, which was used by Cloverleaf in Class I sales. Barber had paid its producers Class IV prices for this milk. The first three counts of the complaint concerned the alleged underpayments for government contract milk. Count 4 involved sales to the other distributor, Cloverleaf Dairy. A hearing on these charges was held by the Board in December, 1958. At the conclusion of the hearing the Board met in executive session to consider the evidence presented. At this meeting, a compromise was proposed whereby the Board would consent to drop the charges embraced in counts 1 through 3 if Barber would agree to make restitution to the producers for the underpayments claimed in count 4. This proposal was offered to Barber, but was not in the form of an official order of the Board. Prior to action by Barber on this proposal, the Board met again in February, 1959, at which time the matter of Barber's alleged underpayments was again brought up for consideration, but without further hearing in the meantime. This meeting resulted in the issuance of Order 389 finding Barber guilty under all four counts of the complaint and directing that the producers be paid the amounts set forth in the complaint.

The dispute concerning the underpayments for government contract milk resulted from an alleged assignment contract between Barber and its Mississippi affiliate, White Dairy Company, a Mississippi corporation. It appears that Barber and White have the same ownership. During the period in question, Barber assigned its government contracts to White, which then contracted with Barber for the latter to supply the milk necessary to fill these contracts. Barber processed, packaged, and delivered the milk to the government installations, received payment from the government, and endorsed the government checks over to White. White then paid Barber for its services. Barber contends

it was not subject to the price schedule prescribed by Order 372 because the government contracts had been assigned to White and thereafter it was acting only as White's agent. Barber also argues that the Board is without jurisdiction to enforce its price regulations in this transaction because White is a Mississippi corporation and enforcement of such regulations would constitute an undue burden on interstate commerce; also, that the Board has no jurisdiction to fix prices for products to be sold on land ceded by the state to the federal government. Barber also argues that Order 389 is illegal and unconstitutional because it impaired its contract with White.

As to count 4, Barber contends that the Board has no jurisdiction over "interplant sales"; that to hold otherwise would result in an order of the Board being promulgated without a public hearing and, therefore, illegal for lack of due process. Barber further argues that there was a lack of any evidence to support a finding of guilty under count 4.

The State Commissioner of Agriculture and Industries attended the meetings of the Board as an ex-officio member (Code 1940, Tit. 22, § 207, as amended by Act No. 785, appvd. Sept. 11, 1951, Acts 1951, Vol. II, p. 1383. See, also, Act No. 497, appvd. Aug. 21, 1961, Acts 1961, Vol. I, p. 579, further amending § 207) and voted on Orders 372 and 389. Barber contends he had no authority to participate as a voting member, the effect being to invalidate said orders.

The issues presented on this appeal may be stated, in short, as follows:

1. The validity vel non of Order 372;

2. Whether there was a denial of procedural due process in issuing Order 389;

3. The constitutional questions of impairment or abridgement of contracts and undue burden on interstate commerce;

4. Whether there was any evidence to support the finding of guilty under count 4, involving sales to Cloverleaf Dairy;

5. The authority of the Commissioner of Agriculture and Industries to participate in Board meetings as a voting member.

1.

Barber attacks the validity of Order 372 on two grounds, viz:

(1) That the Board, in adopting the order, considered matters within the personal knowledge of its members and not presented by evidence at the hearings on the order held pursuant to Code 1940, Tit. 22, § 223; and that this was a denial of due process.

(2) That the Board, by said order, seeks to control the price paid to producers for "government contract milk," that is, milk sold to military and government agencies for consumption on government installations.

The attack on this order presupposes that its unlawfulness can be questioned by Barber in this proceeding. Section 226, Tit. 22, Code 1940, provides that "[a]ny person affected by any order or action of the board, who deems himself aggrieved by any such order or act may within ten days after receiving notice of any such action or order, have such order, or action reviewed by a writ of certiorari". Barber contends that it was not "aggrieved," within the meaning of this section, by the adoption of Order 372 until the Board adopted Order 389, which applied Order 372 to Barber's pattern of conduct. We are unable to agree with this contention.

■ There is no dispute that Barber operated under Order 372, and had notice of its provisions here under attack, for considerably more than ten days after its adoption. In White Way Pure Milk Company v. Alabama State Milk Control Board, 265 Ala. 660, 665–666, 93 So.2d 509, supra, it was held that an attack on the lawfulness and reasonableness of an order of the Board must be made in the manner prescribed by the legislature, that is, by certiorari within ten days after receiving

notice of the order, and that such attack cannot be made collaterally. In that case, there was certiorari within the prescribed ten days to review the Board's Order 348, which was based, in part, on alleged violations of Order 322. By way of defense to the proceeding, White Way made an attack on Order 322. It was held that such collateral attack could not be made. A similar situation exists in the proceeding before us.

2.

We find no merit in Barber's insistence that it was denied due process in not being given an additional hearing prior to the Board's February meeting, when Order 389 was adopted.

■ It is argued by Barber that the action of the Board is resuming deliberations in February was, in effect, a reopening of the case, and, therefore, in order to satisfy the requirements of due process of law, it should have been granted a new hearing after notice. This argument overlooks the fact that the original deliberations, begun in December, had never been concluded. The deliberations were not brought to an end until Order 389 was adopted at the February meeting. As we view it, the February meeting was simply a continuance of the December deliberations. No official order on the charges against Barber was adopted at the December meeting so as to bring the hearing and deliberations on such charges to an end at that time; and there is no indication that any additional evidence was taken after the December meeting. Consideration of the voluminous evidence contained in the 490-page record discloses a full and fair hearing of the charges against Barber in December, with ample opportunity being given Barber to offer evidence in defense of the charges against it. In fact, there is no contention that the hearing was anything but ample and fair. We perceive no lack of due process in adoption of Order 389 at the February meeting of the Board.

### 3.

The Board and producers contend there was no valid contract between Barber and White which could be impaired because the alleged "contract" was nothing more than a subterfuge designed to circumvent the regulations of the Board. However, we find it unnecessary to deal with this contention. Assuming the contract to be valid, it is our view that there was no unconstitutional impairment of it by the adoption of Order 389.

It is elemental that "the law enters into and defines the obligation of every contract" and that "[a]ll men are charged as matter of public policy with a knowledge of the law pertaining to their transactions." Birmingham Bar Ass'n v. Phillips & Marsh, 239 Ala. 650, 656, 196 So. 725. And "every contract is made with reference to existing law and every law affecting the contract is read into and becomes a part of the contract when made." Bush v. Greer, 235 Ala. 56, 58, 177 So. 341. These principles are directly applicable here.

As already noted, Order 389 resulted from violations of Order 372, which was adopted some eighteen months prior to execution of the alleged "contract" between Barber and White. Order 372 had "the force and effect of law." Section 211, Tit. 22, Code 1940. Accordingly, said order was read into and became a part of the "contract" when made. And Barber thus was charged with knowledge, when contracting with White, that it was required to pay a specified price to its producers. This was an obligation separate and apart from its obligation to White under the "contract" and was in no way affected by Barber's agreement with White.

Order 389 does not interfere with the free flow of milk in interstate commerce. If there is any burden placed on interstate commerce by said order, it is incidental to the paramount objective of the Board in exercising the powers given to it by State law. In our view, said order does not place an unconstitutional burden on interstate commerce.

The State has deemed it vital to the welfare of its people that the milk industry be regulated, so as to prevent harmful practices which would disrupt the production of this essential commodity. Code 1940, Tit. 22, § 205. Cf. Franklin v. State ex rel. Alabama State Milk Control Board, 232 Ala. 637, 169 So. 295. This authority extends to the practice of regulating prices to be paid to producers by distributors. Code 1940, Tit. 22, § 210. The authority stems from the fact that the milk industry is affected with a public interest, because the welfare of the people depends upon an ample supply of milk in wholesome condition. Furthermore, the conditions surrounding the production of milk are such that the producer is in a distinctly disadvantageous position with respect to marketing practices and economic fluctuations. These factors necessitate supervision and regulation of the industry by the State. Code 1940, Tit. 22, § 205, supra.

As we view the situation presented by this record, the effect of Order 389 on interstate commerce is only incidental or indirect and is, therefore, not unconstitutional (there being no overriding action by Congress on the subject). See: Milk Control Board of Pennsylvania v. Eisenberg Farm Products, 306 U.S. 346 at p. 351, 59 S.Ct. 528, 83 L.Ed. 752, where it is said:

> " * * * The grant of the power of regulation to the Congress necessarily implies the subordination of the states to that power. This court has repeatedly declared that the grant established the immunity of interstate commerce from the control of the states respecting all those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation must be prescribed by a single authority. But in matters requiring diversity of treatment according to the special require-

ments of local conditions, the states remain free to act within their respective jurisdictions until Congress sees fit to act in the exercise of its overriding authority. One of the commonest forms of state action is the exercise of the police power directed to the control of local conditions and exerted in the interest of the welfare of the state's citizens. Every state police statute necessarily will affect interstate commerce in some degree, but such a statute does not run counter to the grant of Congressional power merely because it incidentally or indirectly involves or burdens interstate commerce.

\* \* \* \* \* \*

"The purpose of the statute under review obviously is to reach a domestic situation in the interest of the welfare of the producers and consumers of milk in Pennsylvania. Its provisions with respect to license, bond, and regulation of prices to be paid to producers are appropriate means to the ends in view. The question is whether the prescription of prices to be paid producers in the effort to accomplish these ends constitutes a prohibited burden on interstate commerce, or an incidental burden which is permissible until superseded by Congressional enactment. That question can be answered only by weighing the nature of the respondent's activities, and the propriety of local regulation of them, as disclosed by the record.

"The respondent maintains a receiving station in Pennsylvania where it conducts the local business of buying milk. At that station the neighboring farmers deliver their milk. The activity affected by the regulation is essentially local in Pennsylvania. Upon the completion of that transaction the respondent engages in conserving and transporting its own property. The Commonwealth does not essay to regulate or to restrain the shipment of the respondent's milk into New York or to regulate its sale or the price at which respondent may sell it in New York. If dealers conducting receiving stations in various localities in Pennsylvania were free to ignore the requirements of the statute on the ground that all or a part of the milk they purchase is destined to another state the uniform operation of the statute locally would be crippled and might be impracticable. Only a small fraction of the milk produced by farmers in Pennsylvania is shipped out of the Commonwealth. There is, therefore, a comparatively large field remotely affecting and wholly unrelated to interstate commerce within which the statute operates. These considerations we think justify the conclusion that the effect of the law on interstate commerce is incidental and not forbidden by the Constitution, in the absence of regulation by Congress."

The record before us discloses a similar situation.

4.

 Barber contends there was no price-fixing order governing "interplant sales"; hence, a finding of "guilty" under count 4 had the effect of an order being issued by the Board without a public hearing, in violation of the Milk Control Board Act (§ 223, Tit. 22, Code 1940), thereby resulting in a denial of due process. In this connection, emphasis is placed on the fact that personnel employed by the Board knew of no such order. Barber also contends there was no evidence to support a finding of "guilty" under count 4.

"Interplant sales" refer to sales by one distributor to another distributor. In no other way are these sales different from those by a distributor to a retail store or other purchaser. The standing orders of the Board define Class I sales, in part, as milk sold in bulk as raw milk. The Board requires every distributor-licensee to make monthly reports of its sales by class, as a means of checking milk utilization. This permits the Board to determine wheth-

er or not producers are being paid the proper amounts. Barber did not report its sales of raw milk to Cloverleaf in its monthly reports to the Board. Such sales were brought to light when Cloverleaf's reports were examined by the Board's auditors. Barber paid its producers for this milk at Class IV ("surplus" milk) prices, while receiving Class I prices from Cloverleaf. If the producers had been paid at Class I prices, they would have received some $12,000 additional, which is the amount sought in count 4.

The orders of the Board pertaining to sales of this kind are clear enough to include "interplant sales," although not specifically referred to in the orders by that name.

The statute nowhere provides that employees of the Board have the power to interpret the Board's orders. The mere fact that employees knew of no order affecting "interplant sales" is of no real significance in determining whether the Board's orders cover such sales. It seems clear that Cloverleaf sold the milk as Class I milk and, therefore, under the orders of the Board, the producers should have been paid Class I prices by Barber. If a distributor were allowed to circumvent the Board's price regulations as in this instance, one of the prime purposes of the Milk Control Board Act would be effectively destroyed. Distributors could shuttle milk back and forth among themselves so that practically all milk could be considered "surplus milk" and thus subject to the lower prices for that category.

There is testimony in the record that the raw milk purchased by Cloverleaf from Barber was used as bottled milk, and also in filling government contracts. The monthly reports by Cloverleaf to the Board revealed that the milk purchased from Barber was used in Class I sales. In view of these facts, considered in connection with the definition of Class I milk as including "raw milk," it cannot be said that the finding of the Board under count 4 was unsupported by evidence.

**5.**

Barber questions the authority of the Commissioner of Agriculture and Industries to vote as a member of the Board. Code 1940, Tit. 22, § 207, provides that the Commissioner "shall be an ex officio member of the board." In our opinion, this statutory provision makes the Commissioner a member of the Board for all purposes.

■ Although the proper method of determining the Commissioner's authority to serve on the Board is by quo warranto (Alabama State Milk Control Board v. Graham, 250 Ala. 49, 53, 33 So.2d 11; Hodges v. Board of Education of Geneva County, 245 Ala. 64, 67, 16 So.2d 97), we think it appropriate to discuss the question of his authority on this appeal.

■ We perceive no persuasive reason why the Commissioner, as an ex officio member of the Board, should not have the same authority as the appointed members have. "Ex officio" means by virtue or because of an office. Webster's International Dictionary, 2d Ed., p. 894; Ashmore v. Greater Greenville Sewer Dist., 211 S.C. 77, 44 S.E.2d 88, 95, 173 A.L.R. 397; King v. Physicians' Casualty Ass'n of America, 97 Neb. 637, 150 N.W. 1010, 1011. It has been held that an "ex officio member" of a board is one who is a member by virtue of his title to a certain office, and without further warrant or appointment. State ex rel. Hennepin County v. Brandt, 225 Minn. 345, 31 N.W.2d 5, 9. It has also been held that "ex officio members of a public body are members for all purposes and must be counted in determining the presence of a quorum." Louisville & Jefferson County Planning & Zoning Commission v. Ogden, 307 Ky. 362, 210 S.W.2d 771. Perhaps the best discussion of the question coming to our attention is the following from Seiler v. O'Maley, 190 Ky. 190, 227 S.W. 141, 143:

"* * * [W]e can see no logical reason nor has one been presented to us, why an ex officio member of a representative body should not have,

in cases where he is not personally interested, all of the authority of other members. In the one case his power and authority as such member is conferred upon him by that department of the sovereignty having authority to create the board because of the fact of his holding some office, while the other members receive their power and authority because of their election or appointment in the manner provided by the same governmental department. We have no doubt but that it would be competent in the creation of the board to provide that it should be composed entirely of ex officio members, and because some of the members are selected in the manner pointed out in the law creating the board, while others are selected by the terms of the law itself, whether it be a statutory or constitutional provision cannot possibly affect the extent of the power and authority of the members. They are each vested with full power and authority to do any and all things necessary and essential to carry out the purpose of the law in creating the board or body, whether they be ex officio members or selected in the manner provided by law. If, as contended by appellants, an ex officio member cannot be counted in forming a quorum, we fail to see any additional reason why such a member should have the right to vote or should have his vote counted in the transaction of any other business of the body. To our minds the rule contended for, pursued to its only logical conclusion, would result in depriving the ex officio member of all voice in the proceedings of all meetings and render his position on the board void of all effect except perhaps to entitle him to be present at the meeting. Such an absurd consequence was never contemplated. On the contrary, when one is made by the proper authority an ex officio member of a created body or board, it is to be presumed that those responsible for its creation had some purpose in view in designating the ex officio member. Manifestly that purpose was to constitute that individual a member of the board or body because of his holding some office of trust, and that whoever held that office should perform, in addition to his official duties, also those incumbent upon the board of which he was made an ex officio member."

Error to reverse not appearing, the judgment appealed from is due to be affirmed.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and COLEMAN, JJ., concur.