SELLERS, Justice.
Kimberly Denise Blalock appeals from an order of the DeKalb Circuit Court holding that Crimson Jade Sutphin is the rightful beneficiary of a policy insuring the life of Loyd Sutphin, Jr. ("Loyd"), issued by New York Life Insurance Company. We affirm.
I. Facts and Procedural History
In late 2011, an agent for New York Life met with Loyd at his place of work in Chattanooga, Tennessee. At that time, Loyd completed an application for a $250,000 individual whole life-insurance policy. In that application, he listed his home address in Henegar, Alabama, and named his daughter, Sutphin, as the sole beneficiary. Shortly thereafter, New York Life issued Loyd a life-insurance policy in accordance with that application and delivered it to him at his place of work in Chattanooga.
In October 2012, Loyd married Blalock, and they lived together at his home in Henegar. Soon after, in December 2012, Loyd submitted a change-of-beneficiary-designation form to New York Life, designating Blalock and Sutphin each as a 50% beneficiary under the policy. A few years later, in February 2016, Loyd and Blalock divorced; however, the life-insurance policy was not addressed in the divorce judgment, and Loyd never changed the beneficiary designation following the divorce.
*522 Loyd died later that year on December 23, 2016.
In April 2017, Sutphin filed a action in the DeKalb Circuit Court,[1] seeking a judgment declaring that she was the rightful beneficiary of the entire proceeds of the New York Life policy because, she asserted, pursuant to § 30-4-17, Ala. Code 1975, Blalock's beneficiary designation had been revoked upon her divorce from Loyd. Blalock moved to dismiss the action, arguing that Tennessee, not Alabama, law should govern and, thus, that the DeKalb Circuit Court did not have subject-matter jurisdiction to hear the case.[2] The circuit court denied the motion to dismiss; Blalock filed a motion to reconsider the denial. At an evidentiary hearing on her motion to reconsider, Blalock again argued that the DeKalb Circuit Court lacked subject-matter jurisdiction but also asserted that the application of § 30-4-17 in this instance violated § 22 of the Alabama Constitution of 1901; the circuit court denied Blalock's motion to reconsider.
The case proceeded to a bench trial, at which Blalock argued that she and Loyd had established a common-law marriage after their divorce and before his death, thereby reviving her beneficiary designation under the policy. The circuit court heard testimony from numerous witnesses on this issue, most of whom testified on Blalock's behalf. On March 26, 2018, the circuit court issued a final order in the case, holding that Sutphin was the rightful beneficiary under the policy because Blalock's beneficiary designation had been revoked by virtue of § 30-4-17 and no common-law marriage existed to revive that designation before Loyd's death.
Blalock then filed this appeal asserting (1) that the circuit court did not have subject-matter jurisdiction to adjudicate the case; (2) that the application of § 30-4-17 violated § 22, Ala. Const. 1901; and (3) that the circuit court erred in finding that Blalock and Loyd were not remarried at common law before his death.
II. Subject-Matter Jurisdiction
Blalock first argues that the DeKalb Circuit Court did not have subject-matter jurisdiction to adjudicate the underlying action. We disagree.
"Matters of subject-matter jurisdiction are subject to de novo review." DuBose v. Weaver, 68 So.3d 814, 821 (Ala. 2011). Under § 12-11-30, Ala. Code 1975, the circuit courts of this state "have exclusive original jurisdiction of all civil actions in which the matter in controversy exceeds ten thousand dollars ($10,000), exclusive of interest and costs."
This action was filed as a request for a declaratory judgment in accordance with Rule 57, Ala. R. Civ. P., and §§ 6-6-222 and 6-6-223, Ala. Code 1975. Specifically, Sutphin requested a judgment declaring that she is the rightful, sole beneficiary of Loyd's life-insurance policy and that, by virtue of § 30-4-17, Blalock has no legal right to any proceeds from the policy. The proceeds in dispute amount to over *523 $132,000.[3] The jurisdictional threshold was, therefore, clearly met.
Blalock's claim that the circuit court lacked subject-matter jurisdiction rests primarily on her assertion that Tennessee's substantive law should govern any interpretation and implementation of the terms of the life-insurance policy. Even if that were true, however, the circuit court still maintained subject-matter jurisdiction over the action. The question of the propriety and applicability of subject-matter jurisdiction is distinct from the question of what forum's law should be applied to interpret a contract. See Cherokee Ins. Co. v. Sanches, 975 So.2d 287 (Ala. 2007) (holding that the circuit court should have applied Tennessee law to plaintiff's claim seeking uninsured-motorist benefits under automobile-insurance policy without ever questioning if subject-matter jurisdiction was proper).
Because Blalock's subject-matter-jurisdiction argument was essentially a choice-of-law argument, it is appropriate to address whether the circuit court was correct in applying Alabama law when interpreting the policy. We conclude that it was.
When determining which state's law applies in a contract dispute, Alabama follows the lex loci contractus rule. Cherokee Ins. Co., 975 So.2d at 292. Under this principle, we "first look to the contract to determine whether the parties have specified a particular sovereign's law to govern." Stovall v. Universal Constr. Co., 893 So.2d 1090, 1102 (Ala. 2004). Absent such a specification, we follow the general rule that the "law of the state where the contract was formed" should be applied, "unless it is contrary to [this State's] fundamental public policy." Id.
There is no language in the policy application or the policy itself that specifies a particular state's law to govern its interpretation. Under the general rule, we then look to where the contract was formed. Although Loyd was a resident of Alabama at all times relevant to this action, he applied for the policy and the policy was delivered in Chattanooga, Tennessee, where he worked. The policy was, therefore, formed in Tennessee. See Cherokee Ins. Co., 975 So.2d at 293 (holding that "Tennessee was the place of contract because the policy was issued and delivered to [the policyholder] in that state"). The question now becomes whether the application of Tennessee's substantive law would be contrary to this State's fundamental public policy.
A state's public policy may be found in its constitution, its statutes, its published rules, the decisions of its courts, and the prevailing customs of the state. See San Francisco Residence Club, Inc. v. Baswell-Guthrie, 897 F.Supp.2d 1122, 1172 (N.D. Ala. 2012) (citing 16 Am. Jur. 2d Conflict of Laws § 18 (2012) ). The public-policy exception in a choice-of-law analysis is intended to be narrowly applied; however, "[t]he exception is more likely to apply if the state has memorialized its public policy in a statute." Id. This is in recognition that it is primarily "for the lawmakers to determine the public policy of the state." Twin City Pipe Line Co. v. Harding Glass Co., 283 U.S. 353, 357, 51 S.Ct. 476, 75 L.Ed. 1112 (1931).
This case centers around the applicability of § 30-4-17, which states, in pertinent part:
*524 "(b) Except as provided by the express terms of a governing instrument, a court order, or a contract relating to the division of the marital estate made between the divorced individuals before or after the marriage, divorce, or annulment, the divorce or annulment of a marriage:
"(1) revokes any revocable:
"a. disposition or appointment of property made by a divorced individual to his or her former spouse in a governing instrument and any disposition or appointment created by law or in a governing instrument to a relative of the divorced individual's former spouse...."
(Emphasis added.) This section was derived from the Uniform Probate Code and expanded the predecessor statute "to cover 'will substitutes' such as ... life insurance and retirement-plan beneficiary designations ... that the divorced individual established before the divorce." Alabama Comment, § 30-4-17 ; see also Uniform Probate Code § 2-804 (2010). The statute was passed by the Alabama Legislature in 2015 and became effective September 1, 2015. Act No. 2015-312, Ala. Acts 2015.
Tennessee has not adopted this section of the Uniform Probate Code. Under Tennessee law, a divorce revokes any testamentary disposition made by a divorced individual to his or her former spouse; however, it does not affect nontestamentary will substitutes such as life-insurance-beneficiary designations. See Tenn. Code Ann., § 32-1-202.
Applying Tennessee law in this case, therefore, violates the fundamental public policy of Alabama. When enacting § 30-4-17, the Alabama Legislature weighed the options and determined that the approach provided for in the Uniform Probate Code better reflected the presumed intent of divorced individuals in this state. Here, the decedent policyholder resided in Alabama at all times relevant to this action. He was divorced in Alabama, and he died in Alabama. His policy application listed his address in Alabama, and he received correspondence from New York Life at that Alabama address. Thus, it is appropriate that Alabama law, and not Tennessee law, govern the interpretation of his life-insurance policy to determine the beneficiaries of the policy and the impact of his divorce on the terms of that policy.
III. Constitutionality of the Statute as Applied
Blalock additionally argues that the application of § 30-4-17 in this case violates the Alabama Constitution. We disagree.
"This Court's review of constitutional challenges to legislative enactments is de novo." Northington v. Alabama Dep't of Conservation & Natural Res., 33 So.3d 560, 564 (Ala. 2009). Article I, § 22, Ala. Const. 1901, states: "That no ex post facto law, nor any law, impairing the obligations of contracts ... shall be passed by the legislature ...." This section uses language virtually identical to that of Art. I, § 10, of the United States Constitution, which states: "No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligations of Contracts ...." Indeed, this Court has previously stated that the Alabama Contracts Clause and the federal Contracts Clause have the same purpose.[4]
*525 Recently, in Sveen v. Melin, 584 U.S. ----, 138 S.Ct. 1815, 201 L.Ed.2d 180 (2018), the United States Supreme Court considered a similar challenge to a Minnesota revocation-on-divorce statute as violative of the federal Contracts Clause by revoking the named beneficiary under a life-insurance policy. The Court began its analysis by providing the following framework for how it reviews a challenge under the Contracts Clause:
"[N]ot all laws affecting pre-existing contracts violate the Clause. To determine when such a law crosses the constitutional line, this Court has long applied a two-step test. The threshold issue is whether the state law has 'operated as a substantial impairment of a contractual relationship.' In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights. If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation. In particular, the Court has asked whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.' "
584 U.S. ----, 138 S.Ct. at 1821-22 (internal citations omitted).
The Supreme Court concluded that Minnesota's statute did not substantially impair the life-insurance contract for three reasons. "First, the statute is designed to reflect a policyholder's intent--and so to support, rather than impair, the contractual scheme." 584 U.S. ----, 138 S.Ct. at 1822. Second, the law is unlikely to disturb policyholder expectations because "an insured cannot reasonably rely on a beneficiary designation remaining in place after a divorce." 584 U.S. ----, 138 S.Ct. at 1823 (noting that "divorce courts have wide discretion to divide property between spouses when a marriage ends"). And finally, "the statute provides a mere default rule," which the policyholder can undo by sending a change-of-beneficiary form to his insurer. 584 U.S. ----, 138 S.Ct. at 1822.
In its opinion, the Supreme Court specifically discussed the fact that the Minnesota statute was modeled after the same section of the Uniform Probate Code from which Alabama's statute was derived. 584 U.S. ----, 138 S.Ct. at 1819 (noting that 26 states, including Alabama, have "adopted revocation-on-divorce laws substantially similar to the [Uniform Probate] Code's"). Its reasoning in upholding the Minnesota statute is, therefore, heavily instructive here.
In 2015, when § 30-4-17 became effective, it did not retroactively impair any existing contractual obligations. Instead, it created a prospective default rule, i.e., that a divorce effectively revokes any revocable beneficiary designation in favor of the former spouse, absent further action by the policyholder. Nevertheless, Blalock argues that the circuit court's application of this statute violated her and Loyd's constitutional rights because, she says, "[t]here is no evidence, that [Loyd] ever learned of the Alabama statute, or its effect, on his insurance policy."[5] Thus, Blalock asks this *526 Court to presume Loyd's ignorance of the law and, based on that presumption, to conclude that applying this statute to the policy violated his rights under the Alabama Constitution of 1901. We cannot entertain either request. See Barber Pure Milk Co. of Montgomery v. Alabama State Milk Control Bd., 275 Ala. 489, 494, 156 So.2d 351, 355 (1963) ("It is elemental that ... '[a]ll [persons] are charged as a matter of public policy with a knowledge of the law pertaining to their transactions.' ").
As discussed in Sveen, policyholders should be aware that a divorce may affect a beneficiary designation in favor of their former spouse. Moreover, § 30-4-17 leaves open an avenue for the policyholder to reinstate the former spouse as a beneficiary if the policyholder so desires. It, therefore, does not unconstitutionally impair any contractual relationship. Furthermore, because the holding in Sveen is so analogous to this situation, to reach a different result could create a greater misunderstanding about the impact of divorce on contractual will substitutes. Here, we establish clear guidelines to promote stability in our laws and to clarify that a divorce, or annulment, affects a beneficiary designation under any number of contractual documents such that spouses should carefully consider how to address beneficiary designations, mindful that our laws (as in many other instances) provide a default in the absence of action by divorcing spouses.
IV. Existence of a Common-Law Marriage
Finally, Blalock contends that she and Loyd established a common-law marriage following their divorce, thereby reviving her beneficiary designation in the life-insurance policy. See § 30-4-17(e) ("Provisions revoked solely by this section are revived by the divorced individual's remarriage to the former spouse or by a nullification of the divorce or annulment."). Because we must presume that the circuit court's findings of fact are correct, we affirm its holding that a common-law marriage did not exist between Blalock and Loyd.
Common-law marriage has now been abolished in Alabama. See Ala. Code 1975, § 30-1-20. However, "[a]n otherwise valid common-law marriage entered into before January 1, 2017, shall continue to be valid in this state." Id.
We have previously stated that " '[c]ourts of this state closely scrutinize claims of common law marriage and require clear and convincing proof thereof.' " Lofton v. Estate of Weaver, 611 So.2d 335, 336 (Ala. 1992) (quoting Baker v. Townsend, 484 So.2d 1097, 1098 (Ala. Civ. App. 1986) ). Traditionally, the following elements must be present for a common-law marriage to exist: "1) capacity; 2) present, mutual agreement to permanently enter the marriage relationship to the exclusion of all other relationships; and 3) public recognition of the relationship as a marriage and public assumption of marital duties and cohabitation." Boswell v. Boswell, 497 So.2d 479, 480 (Ala. 1986). "The determination of whether a relationship between a man and a woman was intended as a common-law marriage is made on the facts of a particular case, with regard to the situation and circumstances of the individuals involved." Id.
The record indicates that Blalock and Loyd were originally married in October 2012 and that they divorced in February 2016. At some point in October 2016, the two reunited and lived together for approximately two months before Loyd died on December 23, 2016. The circuit court heard testimony from 12 different witnesses *527 on this issue and also considered documentary evidence that was submitted. In its final order, the circuit court noted that most of the witnesses indicated that they could not tell a difference between the couple's relationship when they were married and their relationship upon reuniting. However, the circuit court also found that the couple intended to be remarried in an official ceremony in the future. In fact, Loyd repurchased the original wedding rings in November 2016 from Blalock's niece, who had bought them following the divorce.
Relying on this Court's opinion in Turner v. Turner, 251 Ala. 295, 297, 37 So.2d 186, 188 (1948), in which we stressed that "[t]here must be a mutual understanding to presently enter into the marriage relationship," the circuit court held that, although Blalock and Loyd intended to remarry, they were not married when Loyd died. Whether the parties had the present intent to enter the marriage relationship is a question of fact. Dyess v. Dyess, 94 So.3d 384, 387 (Ala. Civ. App. 2012). Likewise, "[a] trial judge's findings of facts based on ore tenus evidence are presumed correct, and a judgment based on those findings will not be reversed unless they are found to be plainly and palpably wrong." Lofton, 611 So.2d at 336 (citing Copeland v. Richardson, 551 So.2d 353, 354 (Ala. 1989) ).
The circuit court considered the facts and circumstances surrounding the relationship between Loyd and Blalock, with evidence from numerous witnesses and documents. We cannot substitute our judgment for the circuit court's unless we determine that there was insufficient evidence to support its determination that Blalock had not established by clear and convincing evidence that she and Loyd had entered into a common-law marriage. Based on the magnitude of the evidence before the circuit court, we cannot say that the circuit court, which heard and weighed the evidence firsthand, erred in finding that there had been no common-law remarriage between Blalock and Loyd.
V. Conclusion
We affirm the circuit court's order, holding that Sutphin is the rightful, sole beneficiary of Loyd's New York Life policy because Blalock's beneficiary designation was revoked under § 30-4-17, by virtue of her divorce from Loyd.
AFFIRMED.
Stuart, C.J., and Bolin and Wise, JJ., concur.
Shaw, J., concurs in the result.

Sutphin and Blalock are both residents of DeKalb County.

In her motion to dismiss, Blalock noted that she had previously filed an action, in March 2017, against New York Life in Hamilton County, Tennessee, regarding the policy. That action was later removed to the United States District Court for the Eastern District of Tennessee, and Sutphin was added as a party. However, the record indicates that the federal district court in Tennessee stayed that case pending a determination of whether the DeKalb Circuit Court intended to take jurisdiction over the matter. Thus, we presume Blalock's original action has since been dismissed.

Blalock originally alleged that she was owed $160,000; however, New York Life disputed that that was the proper amount owed under the policy. After granting New York Life's motion to interplead the policy proceeds, the circuit court accepted New York Life's tender of $132,532.89 to the court.

" '[T]o preserve sacred the principle of the inviolability of contracts against that legislative interference that the history of governments has shown to be so imminent, in view of the frequent engendering of popular prejudice, and the consequent fluctuation of popular opinion.' " Opinion of the Justices No. 333, 598 So.2d 1362, 1365 (Ala. 1992)(quoting Edwards v. Williamson, 70 Ala. 145, 151 (1881) ).

In support of this contention, Blalock notes that Loyd purchased a group life-insurance policy from the same insurance agent three weeks before his death in which she and Sutphin were named co-beneficiaries. This, alone, does not conclusively show that Loyd was unaware that, under Alabama law, Blalock's beneficiary designation in the New York Life policy had been revoked by their divorce. In fact, the opposite inference could be drawn, i.e., that Loyd wanted to provide for Blalock by naming her as a beneficiary under a new policy because she would no longer be a beneficiary under the New York Life policy because her status as a beneficiary had been revoked by the divorce.