# GILFILLAN *v.* UNION CANAL COMPANY OF PENNSYLVANIA.

## IN ERROR TO THE SUPREME COURT OF THE STATE OF PENNSYLVANIA.

Argued April 20th, 1883.—Decided November 26th, 1883.

### Constitutional Law—Contract—Corporations.

1. A provision in an act for the reorganization of an embarrassed corporation, which provides that all holders of its mortgage bonds who do not, within a given time named in the act, expressly dissent from the plan of reorganization, shall be deemed to have assented to it, and which provides for reasonable notice to all bondholders, does not impair the obligation of a contract, and is valid.

2. When a corporation, being embarrassed, and owing money to its mortgage bondholders and to others, was authorized by the legislature from which it obtained its franchises to make settlement with its creditors on a plan which provided that all holders of its mortgage bonds who did not, within a fixed period, dissent in writing from the proposed settlement, should be deemed to have assented; and when a large majority of such bondholders assented to such plan, and some dissented, and the plan went into operation: *Held*, that a holder of such bonds who had due

notice, and opportunity to act, and who neither assented to nor dissented from the plan within the time, was bound by its terms as fully as if he had expressly assented to it.

Suit to recover interest on coupons of mortgage bonds. Judgment in the State court for the defendants.

The facts and the alleged causes of error are stated in the opinion of the court.

*Mr. James Duval Rodney* for plaintiff in error.
*Mr. Thomas Hart, Jun.*, for defendant in error.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

The Union Canal Company of Pennsylvania, a corporation of the State of Pennsylvania, issued, in 1853, a series of bonds for the payment of money, amounting in the aggregate to $2,500,000, with coupons for semi-annual interest attached. These bonds and coupons were secured by a mortgage to trustees on the property of the company.

Prior to 1862 the company became pecuniarily embarrassed, and a plan was devised by parties in interest for the settlement of its affairs and liabilities, by which the entire indebtedness, whether secured or unsecured, was to be converted into a funded debt, secured by mortgage, on which interest was to be paid only "out of and from the clear net income and profits of the business of the corporation," but the right of voting at elections and meetings of the corporation was to be given to bondholders as well as stockholders. On the 10th of April, 1862, the legislature of Pennsylvania passed a statute, the purpose of which was to give authority for such an agreement between the company and its creditors. The statute provided in express terms that the agreement, if entered into, should only be binding on such of the holders of the bonds of 1853 "as shall signify their assent in writing thereto; and in case any such bondholder shall fail to file with the president of such corporation his or her refusal in writing, to concur in the said agreement, within three months from the date thereof, such bondholder shall be taken to have assented to the same." Ample provision was made for notice to the bondholders to appear and

express in writing their assents or dissents, and for the preserva-
tion of all the original rights of such as dissented.

Pursuant to this legislative authority, the contemplated
agreement was entered into between the corporation, with the
assent of its stockholders, and the creditors. The notice re-
quired by the statute was given, and bondholders to the amount
of only $85,000 out of the $2,500,000 filed in writing their re-
fusal to concur. All the rest either assented in writing or
failed to signify their dissent.

At the time the agreement was made, Gilfillan, the plaintiff
in error, owned $4,200 of the bonds of 1853, and the coupons
thereon from November 1st, 1857. He had actual notice of the
agreement and the proceedings for its execution, but he neither
signified his assent thereto in writing nor filed with the pres-
ident of the company his refusal to concur. Between the time
of making the agreement and the commencement of this suit
there was not "any clear net income and profits of the business"
of the company.

This suit was brought against the company by Gilfillan on
his coupons running from November 1st, 1857, to May 1st,
1877, inclusive. At the trial a case was stated which presented
for determination the single question whether the agreement of
settlement barred the action. The supreme court of the State
decided that it did, and gave the judgment accordingly. To
reverse that judgment this writ of error was brought.

The precise point we have to decide is whether the statute
which made the failure of a bondholder to signify his refusal
to concur in the agreement of settlement within the specified
time equivalent to an express assent in writing, impaired the
obligation of his bond. Mortgages of the kind of that executed
by this company are of a peculiar character, and each bond-
holder under them enters by fair implication into certain con-
tract relations with his associates. Such bondholders are not,
like stockholders in a corporation, necessarily bound, in the
absence of fraud or undue influence, by the will of the majority,
when expressed in the way provided by law, but they occupy,
to some extent, an analogous position towards each other.
The mortgage, with the issue and distribution of bonds under

it, creates a trust, of which the selected mortgagee, or his duly constituted successor, is the trustee, and the bondholders primarily, and the stockholders ultimately, the beneficiaries. It not unfrequently happens that compromises and adjustments of conflicting interests become necessary in the course of the administration of such trusts. As in the present case, a very large majority of the bondholders sometimes think it is for their own interest as well as that of their associates to surrender a part of their rights and accept others instead, and they prepare and submit for execution an agreement, the object of which is to carry their plan into effect. No majority, however large, can compel a minority, small though it be, to enter into such an agreement against their will, and under the Constitution of the United States, it is probable that no statute of a State, passed after the bonds were issued, subjecting the minority to the provisions of the agreement without their consent, would be valid. But it seems to us a proper exercise of legislative power to require a minority to act whenever such an arrangement is proposed, and to provide that all shall be bound who do not, in some direct way, within a reasonable time after notice, signify their refusal to concur. To sustain such legislation it is only necessary to invoke the principle enforced in statutes of limitations, which makes neglect to sue within a specified time conclusive evidence of the abandonment of the cause of action. As was said in *Terry* v. *Anderson*, 95 U. S. 628, where the limitation was of actions upon certain legal obligations that embarrassed the entire community at the close of the late civil war, "the obligation of old contracts could not" in this way "be impaired, but their prompt enforcement could be insisted, upon or their abandonment claimed."

As to statutes of limitations, it has always been held that shortening the time within which actions on existing contracts must be brought impairs no obligation of the contract, if a reasonable time is given to bring a suit before the bar attaches. In *Terry* v. *Anderson*, *supra*, it was said:

"In all such cases the question is one of reasonableness, and we have, therefore, only to consider whether the time allowed in this

statute is, under all the circumstances, reasonable. . . . In judging of that we must place ourselves in the position of the legislators, and must measure the time of limitation in the midst of the circumstances which surround them as nearly as possible ; for what is reasonable in a particular case depends upon its particular facts."

What was said there seems to us equally applicable to the present case. There " the business interests of the entire people of the State had been overwhelmed by a calamity common to all. Society demanded that extraordinary efforts be made to get rid of all embarrassments, and permit a reorganization on the basis of the new order of things." Here a canal company, encumbered with a large bonded and floating debt, was bankrupt. The payment of its debts in the ordinary way was impossible. It is fair to infer from the case stated that the interest on the mortgage debt had been in arrear for years, and the floating debt which was unsecured amounted to at least $500,000, or one-fifth of the amount of the mortgage. In this condition of things undoubtedly the bondholders might have foreclosed their mortgage, and thus secured the proceeds of a sale of the mortgaged property, but to a very large majority this seemed unadvisable, and the reason is apparent. The property they had as security was a canal and its appurtenances. Purchasers of such property at advantageous prices were not easily found. Unless the bondholders themselves bought, a large sacrifice must almost necessarily be made, and but a small sum realized for distribution. If the bondholders did buy, it might be necessary for them to operate the canal and assume corresponding liabilities. The experience of the company in the past gave no encouragement of success in such an undertaking, and so a majority of the bondholders came to the conclusion that if they could be permitted to take part to some extent in the control of the business, it was better to let the property remain in the hands of the company without a foreclosure, and to demand their interest only as it could be paid out of profits actually realized. The question now is not whether this scheme was or was not a wise one. A majority of the bondholders thought it

was, while some did not.  Unless all, or nearly all agreed, nothing could well be done.  Hence application was made to the legislature, not to require all bondholders to adopt the plan and become bound by it, but to indicate whether they would or would not.  If any said they would not, then it would be necessary for those who favored the scheme to determine whether, in view of such a dissent, they would go on and leave the dissenters at liberty to assert their rights.  That would of course depend in a large degree upon the number of those who dissented and the amount of bonds they held.  Prompt action was also important.  In view of this, three months was fixed as the time within which the election must be made.  There is no complaint of the length of time given, and if there was it could make no difference in this case, because Gilfillan had actual notice, and three months was certainly time enough for him to determine in his own mind whether an assent or dissent was most for his interest.  So that the only question really presented to us is whether it was unreasonable to provide that a failure to dissent should be taken as an assent.  What the majority wanted to know was how many would not come into the scheme, and the way the assent or dissent should be signified was a matter of but little importance, provided it was understood by the bondholders.  The legislature, in the exercise of its discretion, saw fit to provide that every bondholder should be taken to have elected to become bound by the agreement, unless he filed in writing with the president of the company his refusal to concur.  This was the way the vote was to be taken and the will of the bondholders ascertained.  All who did not vote against were to be counted in favor of the plan.  This being understood, no bondholder can complain, if it was within the power of the legislature to require him to act at all.  If he does not wish to abandon his old rights and accept the new, all he has to do is to say so in writing to the president of the company.  Inaction will be taken as conclusive evidence of abandonment, just as the failure to bring suit within the time allowed by a statute of limitation is evidence of the abandonment of an existing cause of action.

The same principle was applied in *Vance* v. *Vance*, 108 U.

S., where it was held that an article in the Constitution of Louisiana, adopted in 1868, which provided that existing secret mortgages and privileges should cease to have effect against third persons after the 1st January, 1870, unless before that time recorded, did not impair the obligation of a contract between an infant and her natural tutor. Mr. Justice Miller, in delivering the opinion of the court, after stating that the strong current of modern legislation and judicial opinion was against the enforcement of secret liens on property, said:

"We think that the law in requiring the owner of this tacit mortgage, for the protection of innocent persons dealing with the obligor, to do this much to secure his own right, and protect those in ignorance of those rights, did not impair the obligation of the contract, since it gave ample time and opportunity to do what was required and what was eminently just to everybody."

And in *Jackson* v. *Lamphire*, 3 Pet. 280, it was said:

"It is within the undoubted power of State legislatures to pass recording acts, by which the elder grantee shall be postponed to a younger, if the prior deed is not recorded within the limited time; and the power is the same whether the deed is dated before or after the recording act."

We conclude, therefore, that it is within the just scope of legislative power to require bondholders, interested in common with others in a trust security, to signify their assent to or dissent from a plan proposed by proper persons for the compromise and adjustment of matters of difference affecting their common interests, and that the statute involved in this suit is of that character and valid.

*Judgment affirmed.*