**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**


The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PRIME THERAPEUTICS LLC, | DIVISION ONE |
| Appellant, | No. 84030-4-I |
| v. | PUBLISHED OPINION |
| WASHINGTON STATE OFFICE OF INSURANCE COMMISSIONER, | |
| Respondent. | |

DWYER, J. — Recognizing the economic challenges faced by retail pharmacies, particularly those in rural and underserved communities, our state legislature enacted legislation regulating the pharmacy benefit managers that contract with such pharmacies. In so doing, our legislature established regulatory oversight of pharmacy benefit manager reimbursement decisions and an appeals process whereby pharmacies can seek review of such decisions. In subsequent amendments to the legislation, our legislature broadened the categories of reimbursement decisions within the law's regulatory reach.

Here, Prime Therapeutics, a pharmacy benefit manager (PBM), appeals from eight final orders of the Office of the Insurance Commissioner (OIC), which concluded that the PBM failed to comply with regulatory requirements in reimbursing claims submitted by Cle Elem Pharmacy. Prime Therapeutics asserts on appeal, as it did during administrative proceedings, that the pertinent

No. 84030-4-I/2

statute is inapplicable to those reimbursement claims. Because the PBM's preferred interpretation of the statute contravenes both the administrative code and the statute's plain language, this contention is unavailing. We additionally conclude that Prime Therapeutics' assertion that the statute contravenes our state and federal contract clauses is without merit. Accordingly, we affirm the OIC's final orders.

I

A

Prime Therapeutics is a PBM that acts as an intermediary between the pharmacies with which it contracts and pharmaceutical manufacturers to administer the prescription drug benefit portions of health care plans. See H.B. REP. ON ENGROSSED SUBSTITUTE S.B. 5857, at 2, 64th Leg., Reg. Sess. (Wash. 2016). Cle Elem Pharmacy, a retail pharmacy with fewer than 15 retail outlets in Washington, contracts with Prime Therapeutics. According to Prime Therapeutics, the parties' agreement provides that claims submitted by Cle Elem Pharmacy may be reimbursed pursuant to a maximum allowable cost (MAC) list or a reimbursement rate calculated from the Average Wholesale Price (AWP).[1] Pursuant to the contract, the "'MAC' means the list delineating the maximum per unit reimbursement as established and solely determined by Prime for a multiple source prescription drug . . . at the time a claim is processed." The AWP is "the

---

[1] Neither during administrative proceedings nor on appeal did Prime Therapeutics submit the portions of the parties' contract setting forth the terms for reimbursement decisions. Instead, the PBM submitted only the definitions for MAC and AWP provided in the agreement.

2

average wholesale price of a Prescription Drug Service at the time a claim is processed as established in Prime's price file for that date of service."

From May 2019 through March 2020, Cle Elem Pharmacy filled 11 prescriptions for the drug Levorphanol for the same patient. After confirming available prices with three national drug wholesalers, the pharmacy obtained the drug for the lowest of the three prices. Cle Elem Pharmacy then submitted the 11 reimbursement claims to Prime Therapeutics.

After receiving the claims, Prime Therapeutics reimbursed Cle Elem Pharmacy significantly less for each claim than the amount that the pharmacy had paid to obtain the drugs. The pharmacy filed appeals of the reimbursement decisions to the PBM, and Prime Therapeutics agreed to increase the reimbursement amount paid on two of the 11 claims. Those claims, the PBM explained, were paid from the "MAC list." However, Prime Therapeutics asserted that the remaining nine claims were "not paid pursuant to the MAC list," but instead "reimbursed pursuant to the parties' contractual reimbursement rate, calculated based off of the agreed-upon AWP price." Following a further appeal on one of the claims, the OIC ordered Prime Therapeutics to reimburse the pharmacy for the underpaid amount.

In June 2021, Cle Elem Pharmacy submitted to the OIC a small pharmacy benefits appeal, challenging Prime Therapeutics' reimbursement of the remaining eight claims. Prime Therapeutics asserted that the statute governing reimbursement decisions and appeals resulting therefrom, former RCW

19.340.100 (2016)[2], did not apply to Cle Elem Pharmacy's claims. According to the PBM, this is so because it reimbursed those claims pursuant to the parties' contract, rather than pursuant to a "predetermined list price (also referred to as a MAC price)."

Administrative law judges (ALJs) with the Office of Administrative Hearings thereafter held adjudicative proceedings to determine whether the pertinent statute applied to Cle Elem Pharmacy's eight remaining claims. The ALJs issued eight initial orders concluding that the pharmacy, pursuant to former RCW 19.340.100, was entitled to reimbursement from Prime Therapeutics for the full amount of each claim. The initial orders also imposed on Prime Therapeutics a civil penalty of $1,000 for each claim, as authorized by former chapter 19.340 RCW.

Prime Therapeutics filed a petition for review of each of the eight initial orders. In August 2021, the OIC's reviewing officer issued eight final orders affirming the initial orders. In each final order, the reviewing officer concluded that, pursuant to former chapter 19.340 RCW, Cle Elem Pharmacy is entitled to reimbursement for the full amount of each of the eight claims. The reviewing officer additionally upheld the civil penalty of $1,000 imposed in each of the initial orders.

Prime Therapeutics filed a petition for review of the agency's final orders in the superior court. The appeal was ultimately transferred to this court for direct review.

---

[2] Former RCW 19.340.100 (2016) has been recodified as RCW 48.200.280.

4

No. 84030-4-I/5

B

The history of our state legislature's efforts to regulate PBMs informs our understanding of the issues in this case. Both the impetus for this legislation and our legislature's later amendments to expand its regulatory scope illuminate the circumstances our legislature sought to address.

In 2014, our legislature sought for the first time to regulate PBMs by setting reimbursement standards and providing an appeals process for pharmacies to challenge PBM reimbursement decisions. S.B. REP. ON ENGROSSED SUBSTITUTE S.B. 6137, 63d Leg., Reg. Sess. (Wash. 2014); H.B. REP. ON ENGROSSED SUBSTITUTE S.B. 6137, 63d Leg., Reg. Sess. (Wash. 2014). Public testimony evidenced the economic challenges faced by Washington pharmacies, especially those in rural and underserved communities, which were described as being in a "desperate state." S.B. REP. ON ENGROSSED SUBSTITUTE S.B. 6137, at 3. See also H.B. REP. ON ENGROSSED SUBSTITUTE S.B. 6137, at 2-4. Testimony indicated that "[t]he growth of the [PBM] business has resulted in business practices . . . that have made it hard for pharmacies to stay in business." H.B. REP. ON ENGROSSED SUBSTITUTE S.B. 6137, at 4. Pharmacists reported taking "huge financial losses on some drugs" because "they are consistently reimbursed less [than] they paid for the drugs." S.B. REP. ON ENGROSSED SUBSTITUTE S.B. 6137, at 3.

In response to such testimony, our legislature enacted a bill restricting PBMs to setting a "maximum allowable cost" only for drugs falling within certain categories. The legislation additionally required PBMs to establish a process

5

whereby pharmacies could appeal PBM reimbursement decisions for such drugs. ENGROSSED SUBSTITUTE S.B. 6137, § 10(2)(a), (3), 63d Leg., Reg. Sess. (Wash. 2014). The 2014 legislation defined "maximum allowable cost" as "the maximum amount that a [PBM] will reimburse a pharmacy for the cost of a drug." ENGROSSED SUBSTITUTE S.B. 6137, § 10(1)(b). It provided that a pharmacy "may appeal [to the PBM] a maximum allowable cost if the reimbursement for the drug is less than the net amount that the . . . pharmacy paid to the supplier of the drug." ENGROSSED SUBSTITUTE S.B. 6137, § 10(3). Thus, pursuant to the 2014 legislation, when a PBM reimbursed a pharmacy for the cost of a drug for which the PBM had set a "maximum allowable cost," the pharmacy could appeal from that decision through an internal appeals process. ENGROSSED SUBSTITUTE S.B. 6137, § 10(1)(a), (3). The legislation required that, if the PBM denied the pharmacy's appeal, the PBM was required to provide the reason for the denial and demonstrate that the pharmacy could obtain the drug "at a price that is equal to or less than the maximum allowable cost" set by the PBM. ENGROSSED SUBSTITUTE S.B. 6137, § 10(4)(c).

Our legislature again addressed the issue of PBM reimbursement practices in its 2016 legislative session. Testimony indicated that pharmacies continued to be reimbursed by PBMs in amounts substantially less than the

purchasing costs for many prescription drugs.[3]  S.B. REP. ON FIFTH ENGROSSED

SUBSTITUTE S.B. 5857, at 3, 64th Leg., Reg. Sess. (Wash. 2016); H.B REP. ON

FIFTH ENGROSSED SUBSTITUTE S.B. 5857, at 5, 64th Leg., Reg. Sess. (Wash.

2016).  Testimony noted "tremendous losses," particularly for small pharmacies,

which are "often the only pharmacies available for miles."  H.B. REP. ON FIFTH

ENGROSSED SUBSTITUTE S.B. 5857, at 5.  Our legislature thus adopted

amendments and additions to the prior law that (1) provide enforcement authority

to the OIC, (2) expand the PBM reimbursement decisions that are subject to

regulation, and (3) when certain conditions are met, require PBMs to uphold

reimbursement appeals of pharmacies with fewer than 15 retail outlets in the

state.  FIFTH ENGROSSED SUBSTITUTE S.B. 5857, § 4(1)(a), (3), (6), 64th Leg., Reg.

Sess. (Wash. 2016).

Pertinent here, the 2016 legislation expanded the categories of PBM

reimbursement decisions from which a contracting pharmacy may appeal.  The

legislation adopted in 2014 required a PBM to provide an appeals process for

reimbursement decisions applicable to drugs for which the PBM had set a

"*maximum allowable cost*."  ENGROSSED SUBSTITUTE S.B. 6137, § 10(3)

(emphasis added).  In contrast, the current law, adopted in 2016, provides that a

pharmacy "may appeal its reimbursement for a drug subject to *predetermined*

---

[3] A summary of public testimony on the proposed legislation states:
Despite the [2014] law, [pharmacies] continue to be paid below costs for the
product and we cannot sustain the business this way.  The [PBMs] are not
following the law with the appeals process or listing of market prices.  They
continue to deny requests for reimbursement of the cost of the drugs.  The PBMs
are not updating the costs of the drugs to reflect the market prices [pharmacies]
must pay.
S.B. REP. ON FIFTH ENGROSSED SUBSTITUTE S.B. 5857, at 3.

7

*reimbursement costs* for multisource generic drugs." FIFTH ENGROSSED SUBSTITUTE S.B. 5857, § 4(3) (emphasis added). In elsewhere setting forth which drugs a PBM may place on a cost-limiting "list," the 2016 legislation provides that a "list" is "the list of drugs for which predetermined reimbursement costs have been established, such as a maximum allowable cost or maximum allowable cost list *or any other benchmark prices utilized by the [PBM].*" FIFTH ENGROSSED SUBSTITUTE S.B. 5857, § 4(1)(a) (emphasis added).[4]

Thus, in 2016, our legislature expanded the scope of regulation of PBMs' reimbursements to contracting pharmacies, particularly those pharmacies in rural and underserved communities, which sustain more significant economic loss due to under-reimbursement. Our legislature did so by broadening the categories of PBM reimbursement decisions encompassed within the law. Whereas only reimbursement for drugs subject to a "maximum allowable cost" were previously regulated, ENGROSSED SUBSTITUTE S.B. 6137, § 10(3), current law regulates reimbursement for all drugs subject to "predetermined reimbursement costs." FIFTH ENGROSSED SUBSTITUTE S.B. 5857, § 4(1)(a). This includes drugs subject to a "maximum allowable cost or maximum allowable cost list *or any other benchmark prices utilized by the [PBM].*" FIFTH ENGROSSED SUBSTITUTE S.B. 5857, § 4(1)(a) (emphasis added).

Prime Therapeutics asserts that the reimbursement decisions at issue here are not encompassed within the scope of this expanded regulation.

---

[4] In contrast, the 2014 legislation, which provided an appeals process only for reimbursement decisions for drugs for which a "maximum allowable cost" had been set, defined "list" as only "the list of drugs for which maximum allowable costs have been established." ENGROSSED SUBSTITUTE S.B. 6137, § 10(1)(a), (2)(a).

No. 84030-4-I/9

II

Prime Therapeutics first contends that former RCW 19.340.100 does not apply to the eight reimbursement decisions from which Cle Elem Pharmacy appealed. This is so, according to the PBM, because it reimbursed the pharmacy according to a contractually-agreed upon rate calculated based on the AWP, and, thus, there is no list "for which predetermined reimbursement costs have been established." We disagree. The administrative code definition of "predetermined reimbursement cost" applies to the challenged reimbursement decisions, and the plain language of the pertinent statute demonstrates a clear intent to encompass those decisions within the legislation's regulatory reach. Prime Therapeutics' assertions to the contrary are without merit.

A

1

Judicial review of a final administrative decision is governed by the Washington Administrative Procedure Act (WAPA), chapter 34.05 RCW. Chandler v. Office of Ins. Comm'r, 141 Wn. App. 639, 647, 173 P.3d 275 (2007). "Reviewing courts may grant relief only if the party challenging the agency order shows that the order is invalid for one of the reasons set forth in RCW 34.05.570(3)." Chandler, 141 Wn. App. at 647. As relevant here, we may grant relief due to a "violation of constitutional provisions" or when "[t]he agency has erroneously interpreted or applied the law." RCW 34.05.570(3)(a), (d).

We review de novo "an agency's interpretation or application of the law." Chi. Title Ins. Co. v. Off. of Ins. Comm'r, 178 Wn.2d 120, 133, 309 P.3d 372

9

No. 84030-4-I/10

(2013). Additionally, we "interpret agency regulations as if they were statutes." Shimmick Constr. Co. v. Dep't of Lab. & Indus., 12 Wn. App. 2d 770, 778, 460 P.3d 192 (2020). Pursuant to the WAPA, "[t]he error of law standard 'allows the reviewing court to essentially substitute its judgment for that of the administrative body, though substantial weight is accorded the agency's view of the law.'" Premera v. Kreidler, 133 Wn. App. 23, 31, 131 P.3d 930 (2006) (quoting Franklin County Sheriff's Office v. Sellers, 97 Wn.2d 317, 325, 646 P.2d 113 (1982)). In other words, although we "'accord[] deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues,'" we are "'not bound by an agency's interpretation of a statute.'" Chi. Title Ins. Co., 178 Wn.2d at 133 (quoting City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wn.2d 38, 46, 959 P.2d 1091 (1998)).

2

Washington state law regulates PBM reimbursement decisions and establishes a process whereby pharmacies may appeal from such decisions. To this end, former RCW 19.340.100 restricts which drugs a PBM may place on a "list" of drugs and the PBM's obligations in maintaining and providing transparency of that "list."[5] A "list" is defined as

> the list of drugs for which predetermined reimbursement costs have been established, such as a maximum allowable cost or maximum allowable cost list *or any other benchmark prices utilized by the*

---

[5] For instance, a PBM "[m]ay not place a drug on a list unless there are at least two therapeutically equivalent multiple source drugs, or at least one generic drug available from only one manufacturer, generally available for purchase by network pharmacies from national or regional wholesalers." Former RCW 19.340.100(2)(a). The PBM must also ensure that all drugs on a list are "readily available for purchase" by Washington pharmacies and "are not obsolete." Former RCW 19.340.100(2)(b), (c). The PBM must provide for transparency regarding the list to contracting pharmacies and regularly update any list, including "all changes in the price of drugs." Former RCW 19.340.100(2)(d)-(f).

> *[PBM]* and must include the basis of the methodology and sources utilized to determine multisource generic drug reimbursement amounts.

Former RCW 19.340.100(1)(a) (emphasis added).

Pursuant to authority granted by the statute, the OIC has adopted a rule defining "predetermined reimbursement cost."  See RCW 48.200.900 ("The insurance commissioner may adopt any rules necessary to implement this act."). Thus, consistent with the statute, the administrative code provides: "'Predetermined reimbursement cost' means maximum allowable cost, maximum allowable cost list, or any other benchmark price utilized by the [PBM], including the basis of the methodology and sources utilized to determine multisource generic drug reimbursement amounts."  WAC 284-180-130(17).

In addition to restricting the drugs for which a PBM may set predetermined reimbursement costs, the statute requires that a PBM establish a process by which a pharmacy "may appeal [the PBM's] reimbursement for a drug subject to predetermined reimbursement costs for multisource generic drugs."[6]  Former RCW 19.340.100(3).  A pharmacy "may appeal a predetermined reimbursement cost for a multisource generic drug if the reimbursement for the drug is less than the net amount" that the pharmacy paid to the drug supplier.  Former RCW 19.340.100(3).  If a pharmacy with fewer than 15 retail outlets in Washington can demonstrate that it is unable to purchase a therapeutically equivalent

---

[6] "'Multisource generic drug' means any covered outpatient prescription drug for which there is at least one other drug product that is rated as therapeutically equivalent under the [pertinent FDA publication]; is pharmaceutically equivalent or bioequivalent, as determined by the [FDA]; and is sold or marketed in the state during the period."  Former RCW 19.340.100(1)(c). Prime Therapeutics does not dispute that Levorphanol, the drug at issue here, is a "multisource generic drug."

No. 84030-4-I/12

interchangeable product from a supplier doing business in Washington at the

PBM's list price, then the PBM "shall uphold the appeal of [the] pharmacy."

Former RCW 19.340.100(3); see also WAC 284-180-505(4).  In other words, the

PBM must reimburse small pharmacies, as defined by the statute, at the price

paid by such pharmacies for those drugs if the pharmacy demonstrates that it

could not find the drugs at a lower price than it ultimately paid.

However, if the PBM does not uphold the pharmacy's appeal in this "first

tier appeal," see WAC 284-180-505, the PBM must provide a reason for the

denial and the "national drug code of a drug that has been purchased [by other

Washington pharmacies] at a price that is equal to or less than the

predetermined reimbursement cost for [that drug]."  Former RCW

19.340.100(4)(b); see also WAC 284-180-505(5).  In short, for a drug subject to

"predetermined reimbursement costs," the PBM must show that the pharmacy

could have obtained the drug at a lower price in order to deny the reimbursement

appeal.  If a pharmacy's appeal to the PBM is denied, the pharmacy "may

dispute the decision and request review by the commissioner" within 30 days.

Former RCW 19.340.100(6).

B

Here, in each of the eight final orders, the OIC reviewing officer found that

Cle Elem Pharmacy had shown that it was unable to purchase a drug

therapeutically equivalent to Levorphanol at Prime Therapeutics' list price.  The

reviewing officer further found that, in responding to the pharmacy's appeal of its

reimbursement decisions, "Prime Therapeutics did not produce a name of a drug

wholesaler in Washington where [the pharmacy] could acquire the drug or its therapeutic equivalent at the price [the PBM] reimbursed." Instead, Prime Therapeutics denied the appeal "because the claim was reimbursed according to the [parties'] contract."

Indeed, Prime Therapeutics asserted, as it does here, that it "reimbursed these claims according to the contract, not according to a predetermined list price," which the PBM defined as "a MAC price." However, the reviewing officer concluded that Prime Therapeutics

> denied the appeal based on the belief that because it did not reimburse the pharmacy using the maximum allowable cost (MAC) list, the claim was not appealable under RCW 19.340. However, this is not a lawful basis for denial under RCW 19.340, as the definition of "list" specifically references "any other benchmark prices utilized by the [PBM] . . ." in addition to the maximum allowable cost list or maximum allowable cost.

"[B]ecause the definition of 'list' contemplates other benchmarks used instead of the MAC list," the reviewing officer concluded, "the fact that the AWP less 30 percent was the basis of the reimbursement is not a sufficient basis to deny the appeal under RCW 19.340.100."

1

On appeal, Prime Therapeutics contends that the challenged reimbursements do not constitute "predetermined reimbursement costs" pursuant to former RCW 19.340.100 and, thus, that the statute is inapplicable to those reimbursements. The PBM asserts that, pursuant to the parties' contract, claims can be reimbursed based either on a MAC list or a reimbursement rate

calculated from the AWP.[7]  According to Prime Therapeutics, reimbursement rates calculated from the AWP are not "predetermined" because the AWP is subject to change at the behest of drug manufacturers, and such changes are outside of the PBM's control.  We disagree.  Although the AWP itself is subject to change, the formula from which reimbursement rates are calculated is itself predetermined.  Pursuant to both the administrative code provision defining "predetermined reimbursement cost" and the plain language of former RCW 19.340.100, Cle Elem Pharmacy is entitled to full reimbursement of the eight claims at issue here.

"The goal of statutory interpretation is to discern and carry out legislative intent."  Bennett v. Seattle Mental Health, 166 Wn. App. 477, 483, 269 P.3d 1079 (2012).  We consider the context of the entire statute is effectuating such intent.  Cannabis Action Coal. v. City of Kent, 180 Wn. App. 455, 469, 322 P.3d 1246 (2014), aff'd, 183 Wn.2d 219, 351 P.3d 151 (2015).  When a statute's meaning "is plain on its face," we "must give effect to that plain meaning as an expression of legislative intent."  Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).  "We discern a statute's plain language by considering the text itself, amendments to the statute, and related statutory provisions."  Columbia Riverkeeper v. Port of Vancouver USA, 188 Wn.2d 421, 437, 395 P.3d 1031 (2017).  Moreover, the "'[r]ules of statutory construction apply to administrative rules and regulations, particularly where . . . they are adopted

---

[7] Although Prime Therapeutics did not provide the relevant terms of the contract, the record indicates that the PBM reimbursed Cle Elem Pharmacy for the eight claims at issue in an amount calculated from the formula "AWP – 30%."

pursuant to express legislative authority.'" City of Kent v. Beigh, 145 Wn.2d 33, 45, 32 P.3d 258 (2001) (alterations in original) (quoting State v. Burke, 92 Wn.2d 474, 478, 598 P.2d 395 (1979)).

Here, both the administrative code and the pertinent statute contravene Prime Therapeutics' preferred interpretation of "predetermined reimbursement cost." First, the relevant code provision explicitly defines "any other benchmark price utilized by the [PBM]" as a "predetermined reimbursement cost." It provides: "'Predetermined reimbursement cost' *means* maximum allowable cost, maximum allowable cost list, or any other benchmark price utilized by the pharmacy benefit manager." WAC 284-180-130(17) (emphasis added). To "mean" is "to serve or intend to convey, show, or indicate" or to "signify, denote, [or] express." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1398 (2002). Accordingly, the plain language of WAC 284-180-130(17) provides that "any other benchmark price" is necessarily a "predetermined reimbursement cost."

Prime Therapeutics' preferred interpretation of former RCW 19.340.100 conflicts with the code provision defining "predetermined reimbursement cost." The PBM asserts that, in order to be subject to former RCW 19.340.100, a reimbursement must qualify as both a "benchmark price" and a "predetermined reimbursement cost."[8] In other words, the PBM contends not all "benchmark price[s]" constitute "predetermined reimbursement cost[s]." Prime Therapeutics' interpretation requires that benchmark prices are simply a subset of

---

[8] Prime Therapeutics does not dispute that reimbursement rates calculated from the AWP constitute "benchmark price[s]." Rather, the PBM asserts simply that, even as "benchmark price[s]," they are not "predetermined reimbursement cost[s]."

predetermined reimbursement costs, where some benchmark prices could nevertheless not qualify as predetermined reimbursement costs. The administrative code, however, indicates that the two are equivalencies—any benchmark prices also constitute predetermined reimbursement costs.

"We give great deference to [an agency's] interpretation of its own properly promulgated regulations, 'absent a compelling indication' that the agency's regulatory interpretation conflicts with legislative intent or is in excess of the agency's authority.'" Litchfield v. KPMG, LLP, 170 Wn. App. 431, 441, 285 P.3d 172 (2012) (internal quotation marks omitted) (quoting Silverstreak, Inc. v. Dep't of Lab. & Indus., 159 Wn.2d 868, 884, 154 P.3d 891 (2007)). Here, our legislature expressly provided that the OIC "shall have enforcement authority over [former] chapter 19.340 RCW" and "may adopt rules to implement [that] chapter." FIFTH ENGROSSED SUBSTITUTE S.B. 5857, § 5(2), (3). Prime Therapeutics' preferred interpretation of the pertinent statute contravenes the definition of "predetermined reimbursement cost" properly adopted by the OIC. Absent an indication that the administrative code provision conflicts with our legislature's intent in enacting that statute, we defer to the OIC's determination that benchmark prices necessarily constitute predetermined reimbursement costs.

Thus, we next consider the plain language of former RCW 19.340.100(1)(a) to determine whether the OIC's definition of "predetermined reimbursement cost" is consistent with legislative intent. The statute provides:

> "List" means the list of drugs for which predetermined
> reimbursement costs have been established, *such as* a maximum

16

> allowable cost or maximum allowable cost list *or any other benchmark prices utilized by the [PBM]* and must include the basis of the methodology and sources utilized to determine multisource generic drug reimbursement amounts.

Former RCW 19.340.100(1)(a) (emphasis added). "[P]redetermine[d]" means "to determine beforehand." WEBSTER'S, supra, at 1786. "[S]uch" means "of a kind or character about to be indicated, suggested, or exemplified," WEBSTER'S, supra, at 2283, while "as" means "for instance" or "by way of example." WEBSTER'S, supra, at 125. Thus, the statutory language "such as" indicates that the three categories following the term "predetermined reimbursements costs" are encompassed within that term. Consistent with the definition set forth in the administrative code, the pertinent statutory provision also indicates that "any other benchmark prices utilized by the [PBM]" constitute "predetermined reimbursement costs."

Prime Therapeutics nevertheless asserts that reimbursement rates calculated from the AWP are not "predetermined" pursuant to the statute. According to the PBM, reimbursement rates calculated from the AWP are not determined beforehand because the AWP, which is set by drug manufacturers, is subject to change. "Predetermined" does not, however, mean "unchanging" or within the control of the PBM itself. Moreover, Prime Therapeutics disregards that the formula provided in the parties' contract, which sets forth the method for determining reimbursement rates from the AWP, is itself predetermined. Although the input to the formula—the AWP—may fluctuate, the formula itself does not. The formula is thus a "benchmark" and is "predetermined."

Additionally, our legislature's amendment in 2016 of the definition of "list" demonstrates intent to expand the reimbursement decisions subject to the

17

statute's regulatory reach. As discussed above, the 2014 legislation defined "list" as only "the list of drugs for which maximum allowable costs have been established." ENGROSSED SUBSTITUTE S.B. 6137, § 10(1)(a), (2)(a). However, the amended version of the law, adopted in 2016, significantly expanded that definition to encompass additional categories of reimbursement decisions. Pursuant to the amended definition, a "list" is "the list of drugs for which predetermined reimbursement costs have been established, such as a maximum allowable cost or maximum allowable cost list or any other benchmark prices utilized by the [PBM]." FIFTH ENGROSSED SUBSTITUTE S.B. 5857, § 4(1)(a). We may consider amendments to statutory language in analyzing the plain language of a statute. Columbia Riverkeeper, 188 Wn.2d at 437. Here, those amendments, consistent with the text of the statute itself, indicate an intent to expand the reimbursement decisions subject to regulation to include those based on "any other benchmark prices utilized by the [PBM]."

2

Thus, the OIC's definition of "predetermined reimbursement cost," set forth in WAC 284-180-130(17), is consistent with the language employed by our legislature in former RCW 19.340.100. We nevertheless recognize that the administrative code definition can reasonably be read as more limiting than the statutory definition of "list" set forth above. Whereas the administrative code states that "'[p]redetermined reimbursement cost' *means* . . . any other benchmark price utilized by the [PBM]," WAC 284-180-130(17) (emphasis added), the statutory language could be read to encompass not only the three

categories of "predetermined reimbursements costs" explicitly listed, <u>see</u> former

RCW 19.340.100(1)(a), but also any other category of reimbursement decision

subject to "predetermined reimbursement costs." In other words, the language

"such as" can be interpreted as including the listed categories without indicating

that those categories are exclusive. Pursuant to such a reading, "[MAC] or

[MAC] list or any other benchmark prices utilized by the [PBM]" qualify as

"predetermined reimbursement costs," but other categories of reimbursement

decisions may also fall within the statute's scope. Thus, the statute can

reasonably be read to be more inclusive than the definition of "predetermined

reimbursement cost" promulgated by the OIC.

However, any possible misstatement in the wording of the administrative

code provision does not affect the propriety of our ruling here. As did the OIC's

reviewing officer, we address only whether the reimbursement decisions

appealed from by Cle Elem Pharmacy are subject to "predetermined

reimbursement costs." Thus, we do not consider whether reimbursement

decisions subject to a MAC, MAC list, or any other benchmark prices utilized by a

PBM could also constitute "predetermined reimbursement costs" and, thus, be

encompassed within the statute's regulatory reach.

Here, whether we rely solely on the plain language of the statute or on the

definition promulgated by the OIC, we arrive at the same conclusion—the

reimbursement costs calculated by Prime Therapeutics on the basis of the AWP

constitute both "benchmark prices" and "predetermined reimbursement costs." It

is for another day to consider whether a PBM's reimbursement decision that

does not fall within the ambit of the three categories listed in former RCW 19.340.100(1)(a) can nevertheless constitute "predetermined reimbursement costs" and be thereby subject to regulation.

3

The administrative code provision defining "predetermined reimbursement cost," though perhaps less inclusive, is consistent with the statutory language setting forth the categories of reimbursement decisions subject to former chapter 19.340 RCW. Prime Therapeutics' interpretation of the statute, which severs the term "predetermined" from the term "any other benchmark prices," is neither mandated by the words used nor consistent with our legislature's purpose in enacting that legislation. Furthermore, the PBM's preferred interpretation is inconsistent with our legislature's intent to broaden the category of reimbursement decisions subject to regulation.

The eight final orders challenged by Prime Therapeutics, under the facts presented to the OIC, were properly decided whether we tether our review to the plain language of the statute or to the pertinent administrative code provision. We conclude, as did the OIC reviewing officer, that the challenged reimbursement decisions are subject to former RCW 19.340.100. We find no error in the reviewing officer's conclusion that the reimbursement decisions at issue here fall within the language of "predetermined reimbursement costs" in the pertinent statute.

No. 84030-4-I/21

III

Prime Therapeutics additionally contends that former RCW 19.340.100, as applied in the final orders, unconstitutionally impairs the terms of the parties' contract. Again, we disagree. Given the highly regulated nature of the pharmaceutical industry generally, and our state's regulation of PBMs specifically, the challenged statute does not impair any reasonable contractual expectations. Moreover, even were that not so, the statute serves the legitimate public purpose of maintaining access to pharmacies in rural and underserved communities. Accordingly, the statute is constitutional.

A

Both our state and federal constitutions prohibit our state legislature from enacting laws that impair existing contractual obligations. U.S. CONST. art. I, § 10 ("No State shall . . . pass any . . . law impairing the obligation of contracts."); WASH. CONST. art. I, § 23 ("No . . . law impairing the obligations of contracts shall ever be passed."). As has our Supreme Court, we "read our state contracts clause as coextensive with the federal constitution's contracts clause when neither party has argued to the contrary." Wash. Food Indus. Ass'n v. City of Seattle, No. 99771-3, slip op. at 34, http://www.courts.wa.gov/opinions/pdf/99771-3.pdf (Wash. Feb. 9, 2023) (lead opinion).[9] The prohibition against impairment of contractual obligations, however, "'is not an absolute one and is not to be read with literal exactness.'"

---

[9] Although we cite here to the lead opinion, our Supreme Court was unanimous in its holding regarding the contract clause claim of error. Wash. Food Indus. Ass'n, No.99771-3, slip op. at 3 (lead opinion).

21

Tyrpak v. Daniels, 124 Wn.2d 146, 151, 874 P.2d 1374 (1994) (quoting Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428, 54 S. Ct. 231, 78 L. Ed. 413 (1934)). Rather, it "must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 410, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983) (quoting Blaisdell, 290 U.S. at 434).

The "threshold inquiry" in determining whether legislation unconstitutionally impairs a contract is "'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" Energy Rsrvs., 459 U.S. at 411 (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244, 98 S. Ct. 2716, 57 L. Ed. 2d 727 (1978)). "To determine whether there is a substantial impairment of a contractual relationship, we consider 'the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights.'" Gonzales v. Inslee, 21 Wn. App. 2d 110, 139, 504 P.3d 890 (2022) (quoting Sveen v. Melin, ___ U.S. ___, 138 S. Ct. 1815, 1822, 201 L. Ed. 2d 180 (2018)). If the legislation constitutes a substantial impairment, "the inquiry turns to the means and ends of the legislation." Sveen, 138 S. Ct. at 1822.

Specifically, we ask whether the legislation "is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" Sveen, 138 S. Ct. at 1822 (quoting Energy Rsrvs., 459 U.S. at 411-12). "[L]egislation does not unconstitutionally impair contractual obligations where the

legislation constitutes an exercise of the police power in advancing a legitimate public purpose." Optimer Int'l, Inc. v. RP Bellevue, LLC, 151 Wn. App. 954, 966, 214 P.3d 954 (2009). Such legislation "may advance a legitimate purpose by remedying a general social or economic problem, and [it] need not only be in response to an emergency." Wash. Food Indus. Ass'n, No. 99771-3, slip op. at 35-36 (lead opinion). Thus, even if legislation constitutes a substantial impairment of contractual obligations, we must uphold that legislation if its "adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" Energy Rsrvs., 459 U.S. at 412 (alterations in original) (quoting U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 22, 97 S. Ct. 1505, 52 L. Ed. 92 (1977)).

B

Here, Prime Therapeutics asserts that former RCW 19.340.100, as applied in the OIC's final orders, constitutes a substantial impairment of its contract with Cle Elem Pharmacy. According to Prime Therapeutics, this is so because the contract "sets forth how reimbursement rates will be calculated and the processes for any appeal of those rates." Br. of Appellant at 23-24. We disagree.

1

First, Prime Therapeutics has not demonstrated that former RCW 19.340.100 interferes with its reasonable contractual expectations. See Sch. Dists.' All. for Adequate Funding of Special Educ. v. State of Washington, 170

Wn.2d 599, 605, 244 P.3d 1 (2010) ("In Washington, it is well established that statutes are presumed constitutional and that a statute's challenger has a heavy burden to overcome that presumption; the challenger must prove that the statute is unconstitutional beyond a reasonable doubt.").  When an industry is heavily regulated, such "pervasive regulation" puts the parties on notice that the government might further intervene in contractual relationships.  Gonzales, 21 Wn. App. 2d at 140.

We find the decision of a federal court upholding similar state legislation against a contract clause challenge to be persuasive.  See Pharm. Care Mgmt. Ass'n v. Rutledge, 240 F. Supp. 3d 951 (E.D. Ark. 2017), aff'd in part, rev'd in part and remanded on other grounds, 891 F.3d 1109 (8th Cir. 2018), rev'd and remanded on other grounds, ___ U.S. ___, 141 S. Ct. 474, 208 L. Ed. 2d 327 (2020).  There, in concluding that the pertinent legislation had not substantially impaired reasonable contractual expectations, the court reasoned that "PBMs cannot be surprised by legislative efforts to protect public health and welfare by protecting pharmacies."  Pharm. Care Mgmt. Ass'n, 240 F. Supp. 3d at 963.  This is because "the pharmaceuticals industry is already highly regulated," and the predecessor statute in Arkansas had already regulated PBMs within that state.  Pharm. Care Mgmt. Ass'n, 240 F. Supp. 3d at 963.  The court further reasoned that PBMs have "been on notice of the national controversy caused by MAC methodology because other jurisdictions have enacted similar laws regulating PBMs."  Pharm. Care Mgmt. Ass'n, 240 F. Supp. 3d at 963.

24

The same is true here. Prime Therapeutics is undoubtedly aware of the highly regulated nature of the pharmaceutical industry in general, and of our state's regulation of PBMs in particular. Multiple states had already enacted legislation regulating the relationship between PBMs and pharmacies when our state legislature, in 2014, first sought to address the economic challenges faced by Washington pharmacies due to PBM reimbursement practices. S.B. REP. ON ENGROSSED SUBSTITUTE S.B. 6137, at 1. PBMs were thus on notice of such regulation when our state legislature, two years later, expanded the scope of those reimbursement decisions subject to our state's law. See FIFTH ENGROSSED SUBSTITUTE S.B. 5857. Because the challenged statute did not disrupt Prime Therapeutics' reasonable contractual expectations, it did not substantially impair the parties' contract.[10] See Pharm. Care Mgmt. Ass'n, 240 F. Supp. 3d at 962.

2

Furthermore, even if the application of former RCW 19.340.100 in the final orders substantially impaired the parties' contract, the statute is nevertheless constitutional because it serves a legitimate public purpose. "[L]egislation does not unconstitutionally impair contractual obligations where the legislation

---

[10] Further complicating Prime Therapeutics' assertion of substantial contractual impairment is the fact that the PBM has not provided the relevant portions of the contact that, it claims, have been substantially impaired by former RCW 19.340.100. Although the excerpts provided include the contractual definitions of "'Average Wholesale Price' or 'AWP'" and "'Maximum Allowable Cost' or 'MAC,'" the excerpts do not include the reimbursement terms purportedly impaired by the challenged legislation.

Without the specific contractual terms alleged to be impaired, we cannot assess to what extent the law may undermine the contractual bargain. Nw. Grocery Ass'n v. City of Seattle, 526 F. Supp. 3d 884, 896 (W.D. Wash. 2021) ("[T]he court cannot properly assess whether the statute 'substantially impairs' Plaintiffs' members' contracts, as Plaintiffs have provided no specific allegations of contracts or contractual terms which the Ordinance might impair."). However, even were we to hold that the contract has been substantially impaired, we would nevertheless uphold the statute's constitutionality. As explained *infra*, the legislation advances a legitimate public purpose and is, therefore, constitutional.

constitutes an exercise of the police power in advancing a legitimate public purpose." Optimer Int'l, Inc., 151 Wn. App. at 966. When the state is not a party to the contract alleged to have been impaired, we generally defer to "'legislative judgment as to the necessity and reasonableness of a particular measure.'" Energy Rsrvs., 459 U.S. at 413 (quoting U.S. Trust Co. of N.Y., 431 U.S. at 22-23). "Moreover, '[i]n determining whether . . . particular legislation tends to promote the welfare of the people of the State of Washington, we must presume that if a conceivable set of facts exists to justify the legislation, then those facts do exist and the legislation was passed with reference to those facts.'" Optimer Int'l, Inc., 151 Wn. App. at 970 (first alteration in original) (quoting State ex rel. Faulk v. CGS Job Ctr., 117 Wn.2d 493, 504, 816 P.2d 725 (1991)).

Bill reports from the proposed 2014 and 2016 legislation evidence the financial distress facing Washington pharmacies due to PBM reimbursement practices. Public testimony showed that small pharmacies in rural and underserved communities were, in particular, finding it difficult to stay in business. Our legislature, in response, expanded the scope of the reimbursement requests that are subject to regulation and, in the 2016 legislation, set forth specific provisions for the protection of small pharmacies in such communities. See former RCW 19.340.100(3).

Prime Therapeutics' suggestion that the challenged legislation is simply intended to provide a benefit to pharmacies themselves is supported by neither the record nor legislative history. Moreover, the fact that legislation "may incidentally benefit pharmacies in the process of protecting the public's ability to

26

No. 84030-4-I/27

access pharmacies does not render the law an insignificant or illegitimate use of the state's police power." <u>Pharm. Care Mgmt. Ass'n</u>, 240 F. Supp. 3d at 963. Because former RCW 19.340.100 serves a legitimate public purpose, the legislation is constitutional even were it to substantially impair Prime Therapeutics' reasonable contractual expectations.

 Affirmed.

Dwyer, J.

WE CONCUR:

Díaz, J.      Andrus, C.J.

27